FILED

2014 May-30  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RHONDA SIMPSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | **NUMBER:** |
| | ) | **5:13-CV-01924-IPJ** |
| BIG LOTS STORES, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT BIG LOTS STORES, INC.

Brian R. Bostick
Katherine E. Reeves
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
420 North 20th Street, Suite 1900
Birmingham, Alabama 35203
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
brian.bostick@ogletreedeakins.com
katherine.reeves@ogletreedeakins.com

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................1

II.    STATEMENT OF UNDISPUTED FACTS...................................2

    A.    Simpson's Employment with Big Lots ...................................2

    B.    The Big Lots Anti-Harassment Policy ...................................3

    C.    The Alleged Conduct By W.C. Collingsworth .......................4

    D.    Simpson's Anonymous Complaint in 2006 Is Resolved, Even Though Simpson Makes No Effort to Participate in the Investigation ...............6

    E.    Big Lots Conducts Another Investigation in 2012 and Simpson, Yet Again, Does Not Participate in the Investigation...................................7

    F.    Simpson Takes Medical Leave .............................................9

    G.    Simpson Files an EEOC Charge and Big Lots Conducts Another Investigation ..........................................................9

    H.    Simpson is Temporarily Released to Return to Medically Restricted Work Duty ..........................................................10

    I.    Simpson Does Not Respond to Requests for Information and Is Deemed to Have Resigned.......................................................11

III.    ARGUMENT.............................................................................12

    A.    Simpson Has Not Shown She Was Subjected to Harassing Conduct Within the 180-Day Period Before the Filing of Her EEOC Charge......12

    B.    Simpson's Hostile Work Environment Claim Fails on the Merits .........13

i

1.   The Alleged Conduct Was Not Based on Simpson's Sex ...........14

2.   The Alleged Harassment Was Not Sufficiently Severe or
Pervasive .......................................................................15

3.   The Conduct at Issue Was Not Physically Threatening or
Humiliating ...................................................................17

4.   The Alleged Harassment Did Not Affect Simpson's Work .........18

5.   Big Lots Is Entitled to Its Faragher Defense................................18

     (a)   Big Lots Exercised Reasonable Care to Prevent and Correct
     Promptly Any Harassing Behavior....................................19

     (b)   Simpson Unreasonably Failed to Take Advantage of Big
     Lots' Preventative and Corrective Opportunities..............21

C.   Simpson's Retaliation Claims Must Fail................................23

IV.   CONCLUSION....................................................................25

# I.     INTRODUCTION

Plaintiff, Rhonda Simpson, is a former Associate Manager at Store Number 333 of Defendant Big Lots Stores, Inc. ("Big Lots") in Florence, Alabama.  She alleges that she was subjected to a sexually hostile work environment and retaliated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  She contends that she was subjected to "sex talk" (i.e., stories of past sexual relations with others and sex-related jokes) by another manager in the store, W.C. Collingsworth. She admits, however, that Collingsworth never engaged in any threatening behavior, never propositioned her for sex, never touched her private parts, and never engaged in any hostile or abusive behavior.  In fact, most of the conduct that Simpson now complains of occurred years before she filed her Charge of Discrimination and should not be considered here.  She claims Collingsworth would tell these stories to men and women alike, which does not implicate Title VII.  Further, the Eleventh Circuit has made clear that mere "sex talk," such as that alleged here, is not considered sexually harassing behavior as a matter of law.

Even if the conduct at issue could be considered sexual harassment under Title VII, Big Lots cannot be held liable for the conduct.  Big Lots has written, published and distributed policies prohibiting harassing behavior and Simpson was provided with multiple avenues of complaint.  The evidence shows that Simpson twice chose not to participate in internal investigations or to disclose any relevant information. More troubling, Simpson, a manager, admitted that she told a co-worker at the store

not to cooperate in one of Big Lots' internal investigations.  In short, Simpson failed to take "full advantage" of Big Lots' preventative measures, as she is required to do under the law.  The record also shows that, despite Simpson's subversive efforts, Big Lots took prompt corrective action against Collingsworth.

Simpson also cannot prove her retaliation claim. She complains that Big Lots did not hold her position open indefinitely while she was on medical leave and that she was later deemed to have resigned her employment.  Simpson went out on medical leave in April of 2012 and exhausted all Family Medical Leave available to her.  As Simpson knows, Big Lots was not required to hold her position open indefinitely after she exhausted her FMLA leave, and therefore her position was filled. In addition, Big Lots informed Simpson repeatedly to stay in contact and to advise of her status while on leave, and that she would be deemed to have resigned her employment if she did not do so.  She undisputedly did not timely respond to these requests and was therefore deemed to have resigned her employment.

Accordingly, Big Lots is entitled to summary judgment on all of Simpson's claims.

## II.       STATEMENT OF UNDISPUTED FACTS[1]

### A.    Simpson's Employment with Big Lots

Rhonda Simpson began working as a cashier at the Big Lots store in Florence,

---

[1] For purposes of this motion and brief only, Big Lots accepts the facts viewed in the light most favorable to Simpson as required under Fed. R. Civ. P. 56.

Alabama in 2002.  (Simpson Depo., at 23-24, Ex.1).  In 2003, Simpson was promoted to the position of Associate Manager, overseeing stockers and the warehouse, as well as some management responsibilities for the front of the store.  (Simpson Depo., at 38-41).  Simpson reported to Store Manager Gary Pagan throughout the time that she worked as an Associate Manger. (Id., at 41-42). W.C. Collingsworth and Lisa Wilson also worked as Assistant Managers at the Florence store. (Id., at 41).  Simpson complains about the behavior of Collingsworth in this lawsuit.  (Doc. 3, pp. 6-8).

**B.      The Big Lots Anti-Harassment Policy**

At all times during Simpson's employment, Big Lots' Harassment-Free Environment policy strictly prohibited any form of sexual harassment and provided examples of the type of behavior that can violate the policy.  (Saenz Decl., ¶ 4, Exs. 1, 3). The policy provides the following Reporting Procedures:

> If you believe someone has violated this Harassment-Free Environment policy, you should promptly bring the matter to the immediate attention of your Manager or Regional Human Resources Manager (RHRM). If you make a complaint under this policy and have not received a satisfactory response, you should contact the Vice President of Associate Relations immediately or call the **GET REAL HOTLINE at 1.866.834.REAL (7325).**

(Saenz Decl., Ex. 1, #795). The Harassment-Free Environment policy also prohibits retaliation against employees who make complaints. (Saenz Decl., Ex. 1, #794, 805).

Simpson received a copy of the Associate Handbook containing Big Lots' anti-harassment policy when hired, and was aware of Big Lots' policies throughout her employment. (Simpson Depo., at 76-77).  Simpson also received the 2008 version of

3

the handbook. (Id., at 76, Ex. 3). She used the Get Real Hotline in 2004-05 to complain about time clock entries. (Id., at 58-60). She also made an anonymous complaint about Collingsworth on the Get Real Hotline in 2006. (Id., at 60-61).

**C.   The Alleged Conduct By W.C. Collingsworth**

W.C. Collingsworth (who is in his seventies and a recovering stroke victim) worked at the Florence store as an Assistant Manager. (Simpson Depo., at 23, 74-75) (Saenz Decl., ¶ 5). Simpson had two primary complaints about Collingsworth: (1) he constantly talked rather than working; and (2) his ramblings would sometimes include either sexually tinged jokes or stories about past sexual conquests. (Simpson Depo., at 42-48, 168-69). Collingsworth never propositioned Simpson or any other female employees in the store for sex. (Simpson Depo., at 23, 47-48, 199). Collingsworth never called Simpson any gender-related derogatory names (such as bitch or slut) or directed hostile language at her. (Id., at 205). Collingsworth was never mean spirited and never took any aggressive or hostile acts towards Simpson. (Id., at 75, 208-209).

Simpson testified that Collingsworth told the following inappropriate stories:

- Collingsworth had sex with a woman in a car in a pineapple field and someone hit the gear shift and they almost went over a cliff.
- Collingsworth said that he was not circumcised when he was born in Kentucky, and would brag that he had a big penis and needed to shift it around.
- Collingsworth said in 2002 that he would knew he would be fine after awaking from his stroke because he woke up with a "hard on."

- Collingsworth was at a bus stop with a young girl, and he got a "hard on" and had to wait for it to go down before he could leave.
- Collingsworth had sex with a woman while he was serving in Vietnam, and she said to him, "no more fucky, you fuck too much."
- Collingsworth said that he was having sex with a woman in a car when a police officer knocked on the door of the car. He had to pull over on the side of the road and pull out a blanket to have sex because he could not wait any longer.

(Simpson Depo., at 174-96). Collingsworth would tell his "sexual" jokes and stories about his life in front of men and women alike, customers and even the bread man. (Simpson Depo., at 175-78)(Wilson Depo., at 25-26, 65, 82, 89-90)(Keeton Depo., at 82).

Prior to 2011, Big Lots did not have employee polo shirts and Simpson wore more form fitting clothes, and she says that Collingsworth allegedly would say "your tits are looking good today" 10 to 15 times over a ten year period. (Simpson Depo., at 50-51). He also allegedly made comments about customers having "big boobs" or a "big butt." (Id., at 50). His comments were not necessarily related to persons he was attracted to: "look at her tits; she's got big boobs; they are sagging; hers are perky." (Id., at 181). He joked that one customer had such a big bottom that "you could probably set a 12 pack on each side." (Simpson Depo., at 203). Collingsworth said to never trust a woman whose "tits were bigger than her head." (Id., at 180). Collingsworth said that he was "shickled titless," and would tell jokes using the

words "fuck" or "pussy," but Simpson could not remember any of them: "I can't recall a joke because I don't have a good memory." (Id., at 179, 203-04).

Simpson testified that Collingsworth never attempted to touch her breasts or other private parts. (Simpson Depo., at 47-49). Collingsworth merely kissed her on the cheek or gave her a hug on occasion. (Simpson Depo., at 48-49). Simpson claimed on one occasion, around 2010, after she had been away from work for several weeks, that Collingsworth greeted her by attempting to kiss her and he would have kissed her lips if she had not turned her face as she approached. (Simpson Depo., at 47-48, 201).

Simpson never explicitly told Collingsworth to stop making inappropriate comments. (Simpson Depo., at 51-54). Simpson testified that Collingsworth's behavior did not cause her to be anything other than "a great worker." (Id., at 44). Simpson does not complain about any of her performance evaluations or reviews and contends that she excelled in all aspects of her job. (Id., at 44-45).

**D.      Simpson's Anonymous Complaint in 2006 Is Resolved, Even Though Simpson Makes No Effort to Participate in the Investigation**

In 2006, Simpson made an anonymous complaint on the Get Real Hotline about Collingsworth. (Simpson Depo., at 60-62). Simpson could not recall the specifics of what she complained about. (Id). The next day, District Manager Bruno Lijoi conducted an investigation in the store into her complaint. (Id., at 71). Simpson was not interviewed because she was not at work when Lijoi conducted the

interviews.  (Simpson Depo., at 71-73). Simpson did not advise Lijoi of what she knew about the situation, and Lijoi did not know Simpson made the anonymous complaint. (Id., at 60-62, 72-74). Simpson admits Collingsworth was issued a written warning by Lijoi at the completion of the investigation. (Id., at 68-70).  Simpson testified that Collingsworth's behavior stopped for a period of time after he was issued the written warning in 2006.  (Simpson Depo. at 75-76).

### E.   Big Lots Conducts Another Investigation in 2012 and Simpson, Yet Again, Does Not Participate in the Investigation

In April of 2012, employee Gina Fulton (now deceased) made a complaint to Store Manager Pagan that Collingsworth brushed his penis against her back while they were working together in the till room. (Simpson Depo., at 87-93). Simpson also advised Pagan that two employees said that Collingsworth was again telling inappropriate stories in the store. (Id., at 93-94, 98).[2]  Simpson went out on medical leave on approximately April 19, 2012.  (Id., at 115-117).  Simpson did not follow up with Pagan about the complaints. (Simpson Depo., at 98).

Pagan immediately gave Collingsworth a written warning dated April 20, 2012, for violation of the Big Lots Standards of Conduct. (Saenz Decl., ¶ 7, Ex. 7). Pagan described the behavior as "brushing up against" an associate and "talking about his

---

[2] Simpson made the conclusory allegation in her deposition that she voiced numerous complaints to Gary Pagan over the years about Collingsworth's sex-related stories.  (Simpson Depo., at 42, 54). She testified Pagan would address the situation with Collingsworth each time she raised an issue, and that Collingsworth's behavior would stop for a while, but eventually his behavior would start again.  (Id., at 57, 75-76).   Simpson's complaints were as much about the fact that Collingsworth was talking instead of working, as they were about him telling inappropriate stories.  (Id., at 93-95, 168-169).

sex life." (Id.).   The write-up instructed Collingsworth that "no inappropriate comments are to be made to offend associates about his or their personal lives." (Id.).

Fulton, apparently dissatisfied with the results, complained to District Manager Anthony Thomas about the same behavior on approximately May 5, 2012.  (Saenz Decl., ¶ 7, Ex. 8).  An anonymous complaint was also made on the corporate hotline at essentially the same time.  (Saenz Decl., ¶ 7, Ex. 9). Thomas went to the store immediately and spent two days interviewing employees about Collingsworth's behavior.  (Saenz Decl., ¶ 7)(Simpson Depo., at 98-99, 164-65).  Simpson was not working in the store when Thomas conducted his investigation. (Simpson Depo., at 107-08, 160-61). Simpson was made aware by her co-workers that Thomas was in the store conducting interviews about the complaint, but she did not call Thomas to advise him of what she allegedly knew regarding Collingsworth.  (Id., at 100-108). Simpson admitted that she frequently talked to Thomas and knew how to contact him. (Id., at 106-107).

Simpson received a telephone call from Fulton after Fulton was interviewed by Thomas.  (Simpson Depo., at 100).  Fulton allegedly had a notebook at her home with "all kinds of information" about Collingsworth. (Simpson Depo., at 99-100).  Fulton mentioned the notebook during the interview and Thomas asked to see a copy. (Id.). Simpson instructed Fulton "under no circumstances, do you give them the notebook." (Simpson Depo., at 100).  Simpson called her attorney, and it was decided that Fulton

would simply give Thomas their attorney's name and telephone number and refuse to cooperate any further in the investigation.  (Id., at 100, 107-08).

Thomas could not verify the touching incident asserted by Fulton. (Saenz Decl., ¶ 8).  Although many of the allegations could not be confirmed, Thomas concluded Collingsworth engaged in inappropriate behavior and issued a Final Counseling Session to Collingsworth for violation of the Big Lots Standards of Conduct.  (Saenz Decl., ¶ 8, Ex. 10).  Simpson admits she did not have any further unprofessional interaction with Collingsworth after Thomas' investigation.  (Simpson Depo., at 164-65).

**F.   Simpson Takes Medical Leave**

Simpson claims she suffered an on-the-job back injury on approximately April 17, 2012, that resulted in an extended medical leave.  (Simpson Depo., at 82-85). In June 2012, while still out on medical leave for her back, Simpson had a non-work related surgery on her right foot and was held out of work by Dr. Jeffrey Schneider for several months. (Id., at 37, 118-119, Ex. 9).  Simpson was approved for FMLA leave and exhausted it on August 8, 2012.  (Id., at 120-22, Ex. 11).

**G.   Simpson Files an EEOC Charge and Big Lots Conducts Another Investigation**

Simpson filed an EEOC Charge over Collingsworth's actions on August 29, 2012.  (Simpson Depo., at 158-59, Ex. 26).  At that time, she had been on medical leave for more than four months and had not had any interaction with Collingsworth

since she left work. (Id., at 162-65). In the Charge, Simpson falsely claimed that
Collingsworth "had not been disciplined," when he had actually been issued two
warnings in 2012 and the 2006 write-up that Simpson knew about when she filed her
EEOC Charge. (Simpson Depo., at 67-69, 183-84, Ex. 26) (Saenz Decl., ¶ 9).
Regional Human Resources Manager Rick Saenz investigated the allegations made in
the Charge, and met with Collingsworth. (Id.). During this meeting, Collingsworth
resigned his employment effective September 26, 2012. (Id.) (Simpson Depo., at
162).

**H.     Simpson is Temporarily Released to Return to Medically Restricted Work
Duty**

On September 20, 2012, Dr. Schneider released Simpson to return to work with
the restriction that she was "not allowed to stand more than three hours at a time."
(Simpson Depo., at 125, Ex. 15).  Per Big Lots' practice, her Associate Manager
position had been filled when she did not return from medical leave after exhausting
her FMLA leave. (Saenz Decl., ¶ 10, Ex. 13, #85). Simpson acknowledges that this is
Big Lots' practice.  (Simpson Depo., at 126-27). Simpson was placed in a part-time
cashier position to accommodate her medical restrictions, but only worked for a
handful of days.  (Id., at 126-30).  Thereafter, Simpson had non-work related surgery
performed on her left foot.  (Id., at 131, Ex. 18).  Simpson's leave was extended until
January 6, 2013. (Simpson Depo., at 140-41, Ex. 23)(Saenz Decl., ¶ 11, Ex. 14).

## I.     Simpson Does Not Respond to Requests for Information and Is Deemed to Have Resigned

By letter dated December 20, 2012, which Simpson acknowledges receiving, Simpson was advised that her leave was ending on January 6, 2013, and was notified:

> Please contact your supervisor/manager before that date so you may be scheduled to work.  **If you need additional leave time or an accommodation to return to work, you are required to contact the Benefits Department before your leave is scheduled to end on 1/6/2013.  If you do not speak with your supervisor/manager or a representative from the Benefits Department before your leave expiration date, we will be forced to conclude you do not wish to return to work and your employment will be terminated.**

(Simpson Depo., at 140-41, Ex. 23).

Simpson did not contact the store manager and did not provide any additional information regarding her medical situation within the requested time frame. (Simpson Depo., at 145-46) (Saenz Decl., ¶ 12). Simpson acknowledges she never made any attempt to return to work:  "after I got demoted, I just didn't go back to work." (Simpson Depo., at 133). Nonetheless, Big Lots Benefits Department sent Simpson another letter on February 5, 2013, again requesting that she contact her manager or provide requested medical documentation by February 13, 2013.  (Id., at 145, Ex. 23).  Big Lots did not receive the requested information from Simpson and deemed her to have resigned her employment effective February 13, 2013.  (Saenz Decl., ¶ 12). Simpson admitted she did not make any effort to speak with anyone at Big Lots

11

until she came by the store on March 4, 2013, almost a month after she had been deemed to have abandoned her job. (Simpson Depo., at 145-46, Ex. 25).

### III.   ARGUMENT

**A.**   **Simpson Has Not Shown She Was Subjected to Harassing Conduct Within the 180-Day Period Before the Filing of Her EEOC Charge**

Simpson filed her EEOC Charge on August 29, 2012. (Simpson Depo., at 158-59, Ex. 26). A plaintiff can only pursue claims based on adverse employment actions that occurred within the 180-day period preceding the filing of the Charge.  See 42 U.S.C. § 2000e-5(e)(1). Here, Simpson has not identified any specific incidents directed at her during the 180-day period.

An exception to the 180-day requirement exists for conduct that constitutes a "continuing violation." However, that exception does not apply here, because Simpson had sufficient information to alert her to "act to ensure her rights were protected" as early as 2006 when she made the first hotline complaint about Collingsworth. Geer v. Marco Warehousing, Inc., 179 F. Supp. 2d 1332, 1337 (M.D. Ala. 2001) (citation omitted). Where a reasonable person would have believed that her rights were being violated, the plaintiff has a duty to make a claim for discrimination or have that claim be time barred. Id., at 1339; Little v. Peach County School District, No. 5:07-CV-101(CAR), 2009 WL 198003, *5 (M.D. Ga. Jan. 27, 2009). The fact that an employee has complained regarding her treatment is "highly suggestive" that she "was able to at the time appreciate that the acts gave rise to a

cause of action." Id. "The continuing violation doctrine does not exist to provide a "second chance" to an employee who allowed a legitimate claim to lapse." Id. (citing Carter v. West Publ'g Co., 225 F.3d 1258, 1264 (11th Cir. 2000).

Simpson says she reported Collingsworth's alleged conduct on the Get Real Hotline in 2006. This complaint demonstrates Simpson was aware her rights were allegedly being violated at that time, yet she waited six years to file her EEOC Charge. Allowing Simpson to now reach outside the 180-day window would provide a perverse incentive for plaintiffs to allow harassment to continue so as to thereby improve the possibility for receiving damages against their employers. As the Eleventh Circuit has held, to excuse such inaction and delay is to essentially make the Faragher defense "optional." See Baldwin v. Blue Cross/Blue Shield, 480 F.3d 1287, 1307 (11th Cir. 2007). Therefore, Collingsworth's conduct that occurred outside of the 180-day time limit cannot serve as the basis for Simpson's hostile work environment claim, and Simpson has not identified any specific actions taken against her during the 180-day period.

## B.     Simpson's Hostile Work Environment Claim Fails on the Merits

To establish a "hostile work environment" claim, Simpson must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) a basis for holding Big Lots liable for the conduct. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245

(11th Cir. 1999). The incidents about which Simpson complains were not sufficiently severe or pervasive to affect Simpson's terms and conditions of employment. Nonetheless, once notified of the incidents, Big Lots made a prompt response to Simpson's complaint and therefore cannot be held liable.

### 1.    The Alleged Conduct Was Not Based on Simpson's Sex

Simpson must establish the alleged harassment was because of her sex. Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) ("but for the fact of her sex, she would not have been the object of harassment").   "We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."   Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 (1998). The allegedly harassing statements and conduct therefore "must be of a sexual or gender-related nature – 'sexual advances, requests for sexual favors, or conduct of a sexual nature.'" Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999), cert. denied, 529 U.S. 1068 (2000)). Collingsworth merely told stories that would be offensive to both men and women.  While this conduct might be inappropriate, there is no evidence that it was directed at Simpson because she is a woman.  Simpson and her co-plaintiffs acknowledged that Collingsworth told his stories to both women and men alike. (Simpson Depo., at 175-78)(Wilson Depo., at 25-26, 65, 82, 89-90)(Keeton Depo., at 82). "Innocuous statements or conduct, or boorish ones that do

not relate to the sex of the actor or of the offended party . . . are not" harassment based on sex. Gupta, 212 F.3d at 583.[3]

## 2.     The Alleged Harassment Was Not Sufficiently Severe or Pervasive

The Supreme Court has directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.   Faragher v. City of Boca Raton, 524 U.S. 775 (1998).   Measured by this criteria, Collingsworth's conduct does not pass muster.

Simpson's complaints about Collingsworth's stories or jokes had nothing to do with her sex and therefore are not considered in determining whether there was severe or pervasive conduct.   See Gupta, 212 F.3d at 583 (writing that acts complained of "must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met").   The overwhelming majority of Simpson's allegations relate to Collingsworth telling stories about past sexual experiences.   The Eleventh Circuit has made clear that "[m]ere 'sex talk,' without more, does not rise to the level of objectively severe and

---

[3] This case is distinguishable from Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir.2010), where the plaintiff provided extensive, specific testimony to identify "a substantial corpus of gender-derogatory language." Id. at 804. The Eleventh Circuit noted that "[i]f the environment portrayed by Reeves . . . had just involved a generally vulgar workplace whose . . . sexually-laden conversation did not focus on the gender of the victim, we would face a very different case." Reeves, 594 F.3d at 811. That is the case here.

pervasive harassment."  <u>Howard v. City of Robertsdale</u>, 168 Fed. Appx. 883, 889-90 (11th Cir. 2006); <u>Conner-Goodgame v. Wells Fargo Bank, N.A.</u>, No. 2:12-cv-03426-IPJ, 2013 WL 5428448, at *7 (N.D. Ala. Sept. 26, 2013) (holding that distasteful sex talk, including statements about the harasser's sex life with his partner were not sufficient to support a claim for hostile work environment).  Collingsworth's comments, while inappropriate, are the "sex talk" type of comments that the Eleventh Circuit holds are <u>not</u> sexual harassment.

Simpson identifies only the following conduct by Collingsworth (most of which is time barred) that could be argued was directed at her because of her sex:  (1) he attempted to kiss her on one occasion in 2010; (2) he kissed her on the cheek or gave her a hug on occasion; (3) he told her that he was "shickled titless"; (4) he told her "your tits are looking good today" 10 to 15 times prior to 2011; and he commented on customers' breasts or bottoms and he told jokes using the word "fuck" or "pussy" but Simpson cannot even remember the specific of the jokes. (Simpson Depo., at 47-48, 51-42, 58-60, 179-181, 203-204).

While this conduct (if true) is certainly inappropriate, it does not amount to "extensive, long lasting, unredressed and uninhibited sexual threats that permeated plaintiff's work environment."  <u>Gupta</u>, 212 F. 3d at 586 (quoting <u>Indest v. Freeman Decorating, Inc.</u>, 164 F. 3d 258, 264 (5th Cir. 1999)). A review of the facts in <u>Mendoza</u> and the cases cited in it reveal that summary judgment has been granted under the "severe and pervasive" standard even where much more egregious conduct

was undisputed to have occurred.  195 F.3d at 1247-48 (conduct not sufficiently severe or pervasive where harasser allegedly said to plaintiff "I'm getting fired up; "rubbed his hip against plaintiff's hip while touching her shoulder and smiling, made sniffing sounds on two occasions while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and harasser's "constant" following and staring at Mendoza in a "very obvious fashion").

### 3. The Conduct at Issue Was Not Physically Threatening or Humiliating

Simpson admits that Collingsworth never called her any gender-related derogatory names or directed hostile language at her. (Simpson Depo. at 205).   She similarly concedes that Collingsworth was never mean spirited and never took any aggressive or hostile acts towards her. (Simpson Depo. at 75, 208-209). The only inappropriate comments that Collingsworth said about Simpson specifically (i.e., "your tits are looking good today") were, according to Simpson's own testimony, poor attempts to compliment her, not humiliate her. (Simpson Depo., at 51-52). Thus, the record contains no evidence from which to find that Collingsworth's behavior was threatening or humiliating.  See Gupta, 212 F.3d at 585 (holding the plaintiff did not establish physically threatening conduct where supervisor stared at her, touched her ring and bracelet, and placed his hand on the inside of her thigh, and raised the hem of her dress four inches with his hand); Mendoza, 195 F.3d at 1248-49 (holding one instance of supervisor brushing against the plaintiff was not

threatening); <u>Minor</u>, 174 F.3d at 857 (holding hostile environment not established where, among other things, supervisor put his arms around the plaintiff and kissed and squeezed her).

### 4.    The Alleged Harassment Did Not Affect Simpson's Work

Simpson says that she successfully performed her job, does not complain about any of her performance evaluations or reviews, and contends that she excelled in all aspects of the job: "I was a great worker."  (Simpson Depo., at 44-45).  In light of <u>Mendoza</u>, this evidence demonstrates that Simpson has no viable hostile work environment claim. <u>See</u> <u>Cartwright v. Talaca, Inc.</u>, 2000 WL 33287445, *7 (M.D. Ala. 2000) (Conduct did not alter plaintiff's terms and conditions of employment where the plaintiff testified she "continued to work as usual, that she worked almost every day, and she did a good job").

In sum, the incidents alleged by Simpson fall far short of the severe and pervasive threshold.  <u>See</u>, <u>e.g.</u>, <u>Mendoza</u>, 195 F.3d at 1247 (and cases cited therein). Simpson cannot demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule, and insult." <u>Harris</u>, 510 U.S. at 21.  The conduct at issue was not based on sex and was neither severe nor pervasive, and Big Lots is entitled to summary judgment. <u>Mendoza</u>, 195 F.3d at 1249, 1251-52.

### 5.    Big Lots Is Entitled to Its <u>Faragher</u> Defense

Under <u>Faragher</u>, 524 U.S. 775 and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998), an employer is not liable for the hostile environment created by one

of its supervisors if the employer proves: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided or otherwise failed to avoid harm.  Both prongs are established here.

### (a)    Big Lots Exercised Reasonable Care to Prevent and Correct Promptly Any Harassing Behavior

An employer may demonstrate reasonable care to prevent sexual harassment by showing the development of "an effective and comprehensive anti-sexual harassment policy," which is "thoroughly disseminated," and to which the employer "demonstrate[s] a commitment to adhering." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).  The employer must also prove that its complaint procedure provides "multiple avenues" for lodging a harassment complaint to ensure the employee has avenues of complaint other than to a manager who is involved in the offensive conduct.  Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298-99 (11th Cir. 2000), cert. denied, 531 U.S. 926 (2000).

Big Lots satisfies the first prong of the affirmative defense. It is undisputed the Harassment-Free Environment policy prohibits all forms of harassment, provides alternate avenues for employees to report such conduct, and was disseminated to employees, including Plaintiff, through the Associate Handbook. See Farley, 115 F.3d at 1553 (holding policy that expressly prohibited sexual harassment, provided multiple avenues to report harassment, and was disseminated and communicated to

staff was reasonable). Simpson acknowledges that she has been aware of Big Lots' anti-harassment policies since her hire and used the policy to complain in 2006. (Simpson Depo., at 77-78, Ex. 4).

An employer may demonstrate reasonable care to correct harassment by taking substantive measures to stop the harassment. See Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1288 (11th Cir. 2003). Here, Big Lots has presented undisputed evidence that it immediately conducted investigations into Simpson's Real Hotline complaint in 2006 and the 2012 complaint in which she was tangentially involved, and took prompt remedial measures on both occasions. The Eleventh Circuit has noted that counseling sessions or warnings, such as those issued here, can serve as appropriate remedial measures.  Baldwin, 480 F.3d at 1287 ("We have held that warnings and counseling of the harasser are enough where the allegations are substantiated"); See also Fleming v. Boeing Co., 120 F.3d 242, 246-47 (11th Cir. 1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action").

While Simpson may argue that Collingsworth should have been terminated, "the complainant does not get to choose the remedy." Baldwin, 480 F.3d at 1306. This is particularly so given Simpson's failure to participate in the 2006 or 2012 investigations and her attempts to discourage the cooperation of others.  Simpson admits that each complaint that she was involved in regarding the Get-Real Hotline

was investigated immediately.  She may argue that Pagan should have done more, but again, her own undisputed testimony was that Pagan would speak to Collingsworth each time she raised an issue. (Simpson Depo., at 57, 75-76).  Those were reasonable steps given that the conduct at issue involved only boorish stories or jokes and not sexual advances, requests for sexual favors or physical touching.

### (b)    Simpson Unreasonably Failed to Take Advantage of Big Lots' Preventative and Corrective Opportunities

To establish the second element of the Faragher-Ellerth defense, the employer must show that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. This failure can take two forms, "not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported." Baldwin, 480 F.3d at1306. The employee is obligated to take "full advantage" of the preventative/corrective measures.  Id. at 1307 (emphasis added).

In Baldwin, the Eleventh Circuit held that Baldwin's refusal to cooperate in the first step of the employer's corrective action process alone was sufficient to defeat her sexual harassment claim. 480 F.3d at 1306. In addition, the court reasoned that "even if [the plaintiff] had not refused to cooperate with the corrective measure . . . her failure to report the harassment" until three and a half months after the first

21

incident and three months and one week after the second incident would be sufficient to establish the second element of the defense." Id. at 1307. Sexual harassment cannot be corrected "without the cooperation of the victims." Id., 480 F.3d at 1307.

Simpson similarly acted unreasonably in several regards. First, she did not properly use Big Lot's preventative opportunities. Simpson acknowledges that the one time that she made a complaint on the Get Real Hotline, that an investigation was undertaken immediately in response to her complaint. (Simpson Depo., at 60-61). Yet, Simpson chose not to advise District Manager Lijoi of her information, thereby precluding Lijoi of understanding the full nature of her complaint. She took the same course of action when District Manger Thomas came to the store in May of 2012.

Simpson's unreasonable stance went a step further in 2012: she actively instructed her co-worker (Gina Fulton) to cease cooperating in the investigation. Simpson admits that she instructed her co-worker, Gina Fulton, to not turn over her notes regarding Collingsworth's alleged behavior and also told her to refuse to cooperate in Big Lots' investigation. (Simpson Depo., at 100, 107-08). Simpson should not be permitted to now argue that Big Lots' investigative efforts were ineffective or deficient. If delay in reporting is sufficient to bar a harassment claim, obstructionist behavior must be as well. See Baldwin, 480 F.3d at 1307-08 (holding that the plaintiff's overall refusal to cooperate in "the company's reasonable attempt to solve the problem" was sufficient to establish the Faragher-Ellerth defense); O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 389 (S.D. N.Y. 2001) ("Having

refused to cooperate with [the employer's] investigation, thereby undermining its legitimacy, plaintiff cannot now claim that defendant's investigation and sexual harassment procedures were ineffective.").

## C.     Simpson's Retaliation Claims Must Fail

Simpson claims that she was "constructively discharged and not allowed to return to work after filing her EEOC Charge." (Doc. 3, ¶ 39).  To establish a prima facie case of retaliation, Simpson must show:  (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally related to the protected expression.  See, e.g., Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  After the Plaintiff proves a prima facie case of retaliation, the Defendant need only to produce evidence that there is a legitimate, non-retaliatory reason for the challenged employment action.  See Pennington, 261 F.3d at 1266. The employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to establish that the proffered reason is false and that retaliation was actually the reason for the challenged action. Id.

Simpson identifies two actions as being retaliatory: (1) not being returned to the Associate Manager position in 2012; and (2) her termination.  Per Big Lots' practice, Simpson's Assistant Manager position had been filled when she did not return from medical leave after exhausting her FMLA leave. (Saenz Decl., ¶ 10). Simpson acknowledges that it is Big Lots' practice to fill an open position if the

employee does not return after exhausting their FMLA leave.  (Simpson Depo., at 126-27).   This practice is specifically authorized by the FMLA.   See 29 U.S.C. §2612(a)(1); 29 C.F.R. § 825.216(c). There is no evidence that Simpson's position was filled for any reason other than that she stayed on leave past the exhaustion of her FMLA leave.

As for Simpson's termination claim, Simpson was discharged six months after she filed her EEOC Charge.  This amount of time between the two events suggests that there is no causal connection between them.   See e.g., Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."). In addition, Simpson cannot dispute Big Lots' legitimate, non-discriminatory reasons for her termination. Simpson admits receiving two separate letters regarding her need to contact the company and advise of her status.  (Simpson Depo., at 130, 140-41, Exs. 17, 23).  She was warned in writing that if she did not respond by a date certain that she would be deemed to have resigned her employment. (Id.) (Saenz Decl., ¶¶ 11, 12). Big Lots did not receive the requested information from Simpson and deemed her to have resigned her employment as of February 13, 2013.  (Saenz Decl., ¶ 12).  Simpson admits she did not contact the store manager and did not provide any additional information regarding her medical situation within the requested time frame. (Simpson Depo., at 145-46). Simpson admitted that she did not make any effort to speak with store management until

March 4, 2013, almost a month after she had been deemed to have abandoned her job. (Simpson Depo., at 145-49, Ex. 25).  Thus, the reasons for her termination are not in dispute.

Because Simpson failed to return to work or advise Big Lots of her status in a timely manner, her retaliatory termination claim must fail.  See Cone v. Longmont United Hosp. Assoc., 14 F.3d 526, 528 (10th Cir. 1994) (affirming grant of summary judgment for employer and holding that plaintiff could not challenge reason offered by defendant for discharge where plaintiff was discharged for failing to return to work after exhausting approved leave of absence); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046 (6th Cir. 1998)(same).

## IV.    CONCLUSION

For all the foregoing reasons, Big Lots is entitled to summary judgment on all of Simpson's claims.  Big Lots respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award Big Lots its costs in defending against this case.

Respectfully submitted,

/s/ Brian R. Bostick
Brian R. Bostick
Katherine E. Reeves
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
420 North 20th Street, Suite 1900
Birmingham, Alabama 35203
Telephone: (205) 328-1900
brian.bostick@ogletreedeakins.com
katherine.reeves@ogletreedeakins.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following and am also serving by hand delivery to the following:

Kimberly R. Dodson
Law Offices of Kimberly R. Dodson, LLC
200 Title Building
300 Richard Arrington Blvd. N
Birmingham, Alabama 35203

/s/ Brian R. Bostick
OF COUNSEL