IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| RHONDA SIMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CV 13-1924-IPJ |
| ) | |
| BIG LOTS STORES, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Pending before the court are defendant Big Lots Stores' motion for summary judgment (doc. 14), a brief in support of said motion as well as evidentiary materials in support thereof (docs. 15–16), plaintiff's response to said motion (doc. 19), and defendant's reply to plaintiff's response (doc. 20). For the reasons discussed below, the court finds that defendant's motion for summary judgment is due to be granted.

## STATEMENT OF FACTS

Rhonda Simpson's troubled interactions with her co-worker W.C. Collingsworth harken back to days long before Collingsworth began allegedly making inappropriate sexual comments to Simpson and her female co-workers.

1

Collingsworth approached Simpson at a Florence McDonald's because he was struck by Simpson's Farrah Fawcett likeness and her husband's University of Kentucky sweatshirt. Simpson Depo. pp. 14–15, 22. Collingsworth remarked on Simpson's good looks and opined that Simpson must be a good cook like all southern women. Collingsworth suggested that Simpson come see him at Big Lots should she ever need a job, and Simpson eventually interviewed with Collingsworth for a cashier position at the store. *Id.* at 16, 23–24. On her application for employment with Big Lots, which plaintiff filed in 2002, Simpson listed Collingsworth as a friend or relative working at Big Lots. *Id.* at 17. Big Lots hired Simpson as a cashier. *Id.* at 24.

After interviewing with Collingsworth and Gary Pagan, Simpson was promoted to the position of associate manager in October of 2003. Simpson Depo. pp. 38–39. Gary Pagan and Collingsworth were also managers at the time. *Id.* at 41. Simpson reported to Pagan. *Id.* Although Simpson stated that she excelled at her job at Big Lots, she also claimed that due to Collingsworth's behavior, she would sneak around the office in order to avoid contact with him. *Id.* at 45–46. However, Simpson also admitted in her deposition that she avoided contact with Collingsworth because he would talk for hours at a time. *Id.* at 46. Simpson further claims that at some point, Collingsworth attempted to kiss her and "he would have

kissed [her] on the lips if [she] hadn't turned [her] cheek for him to kiss [her] on [her] cheek." *Id.* at 47–48. Simpson also claims that Collingsworth engaged in "the touching of arms, hands, shoulders, you know . . ." and "[h]ugging all the time." *Id.* at 48. Simpson further testified in her deposition that Collingsworth made comments about customers' "boobs" and "butt[s]" as well as "said ass and tits and that kind of stuff." *Id.* at 50. Additionally, Simpson claims that Collingsworth told her that her "tits are looking good today" ten to fifteen times over the ten years she worked at Big Lots. *Id.* at 50, 52. However, Simpson admitted that after Big Lots started requiring uniformed polo shirts for managers in 2011-2012, Collingsworth's comments about her breasts practically ceased. *Id.* at 51. Simpson also reported Collingsworth's behavior to Gary Pagan beginning in May of 2003. *Id.* at 54–55.

In her deposition testimony, Simpson further claimed to have reported an instance in which Collingsworth told "perverted stories" "about his hard-on and screwing some lady in a car." *Id.* at 55. Simpson also alleges that at some point Collingsworth told a story about being in a car close to a cliff and as he and a woman were having sex "somebody hit the shift button and if they hadn't have caught it, they would have went over the cliff." *Id.* at 178. Collingsworth also allegedly made "gestures to his crotch and [said] that he would have to lift it up or

make little statements about how big it was and how he had to move it around . . . ." *Id.* at 179. Simpson claims that at some point Collingsworth also said to "[n]ever trust a woman whose tits are bigger than her head," when he saw customers with large breasts. *Id.* at 181. Additionally, Simpson claims that Collingsworth saw an employee on her knees and remarked that he liked his women that way. *Id.* at 192. Simpson further alleges that Collingsworth told her a story about being in a bus stop with a young woman and having to wait to exit the bus stop because "he had got a hard on." *Id.* at 193. Collingsworth also allegedly talked "about being in Vietnam having sex with a Vietnamese and she [said] to him, no more fucky; you fuck too much." *Id.* at 194. Simpson further alleges that Collingsworth told a story about having to throw down a blanket and have sex because he could not wait any longer and that a cop knocked on the car door because the windows were steamed up. *Id.* at 195–96. Collingsworth also allegedly remarked on how large black women's butts are, paging Simpson to the front of the store to show off such women. *Id.* at 202. Simpson further alleges that Collingsworth made several dirty jokes using the words "fucking," "p-word," "whore" and "slut." *Id.* at 203–05. According to Simpson, Collingsworth made such inappropriate comments only to women. *Id.* at 197.

      Simpson, however, also admitted in her deposition that each time she

reported an incident to Pagan, he would arrange a meeting and he would say he discussed the matter with Collingsworth. *Id.* at 57. Following Pagan's actions, Simpson claimed that Collingsworth's behavior "did slow down for a couple of weeks at a time each time he did talk to W.C. about the situation." *Id.*

In 2006, Simpson also contacted Big Lots' employee hotline concerning Collingsworth's alleged sexual harassment. *Id.* at 60–61. Simpson admitted in her deposition, however, that her impetus for calling the hotline was complaints she received from other employees concerning Collingsworth's sexual harassment. *Id.* at 68. In response to Simpson's call, Bruno Lajoie came to investigate the allegations. *Id.* at 61. However, Simpson claims that she never met with Bruno because she made the call anonymously and she was not working the hours that Bruno conducted the interviews. *Id.* at 61, 63–64. Although Simpson knew that Lajoie was conducting an investigation of her anonymous complaint, she made no effort to contact Lajoie to participate in the investigation. *Id.* at 72. Simpson made no other complaints on the hotline other than the 2006 complaint. *Id.* at 70. Following the investigation, Simpson heard that Collingsworth had been written up for the harassment and his behavior stopped for a while thereafter. *Id.* at 75.

Simpson claims that she made another complaint to Pagan concerning Collingsworth's behavior to which he responded that he always discussed

Simpson's complaints with Collingsworth. *Id.* at 94–95. When Pagan asked Simpson if she wanted him to fire Collingsworth, Simpson told Pagan she did not "want anyone to lose their job no matter who you are," but that she wanted the issue resolved. *Id.* at 95. On this occasion, Simpson claims that she informed Pagan that Collingsworth "had made it clear that he was not circumcised" and that "he would tell [them] how he would get a hard on over everything." *Id.* at 95–96. Simpson claims that although Pagan called other employees to come in to be interviewed concerning these allegations, Pagan did not call Simpson. *Id.* at 98–99. Simpson, however, also acknowledged that she was out on medical leave at the time Pagan called other employees to come into interview. *Id.* Simpson claims she found out about the interviews because another employee, Gina Fulton, told her that Anthony Thomas, the district manager, was conducting interviews. *Id.* at 99–101. Simpson further stated that Fulton asked her what to do with a notebook she had detailing Collingsworth's alleged misconduct and that Simpson told Fulton, "under no circumstances do you give them the notebook." *Id.* at 100. Instead, Simpson contacted her attorney on behalf of the two employees. *Id.* Simpson also acknowledged that she never contacted anyone in Big Lots' management to tell them her allegations about Collingsworth. *Id.* at 105. Simpson filed her EEOC charge in late August of 2012. *Id.* at 85.

6

During her employment at Big Lots, Simpson also sustained an injury while removing furniture from a truck. As she was moving furniture, the freight collapsed on top of her and she was pinned between the rail and th furniture. *Id.* at 79. As a result of her injury, Simpson went on leave sometime between April 13th and April 17th of 2012 and claims she tried to work intermittently throughout the following year. *Id.* at 83–85.[1] Simpson claims that she returned to work for a couple of weeks sometime in May, but took leave in June. *Id.* at 123. Simpson acknowledged in her deposition that she witnessed no inappropriate behavior from Collingsworth from the time she took leave in May until she filed her EEOC complaint in August. *Id.* at 164. When Simpson was unable to return to work in August, Big Lots extended her leave and benefits through September. *Id.* at 124. Sometime in late September, Simpson returned to work as a cashier. *Id.* at 125–26. In October 2012, Simpson again requested leave from Big Lots to have surgery done on one of her feet. *Id.* at 131–32. Simpson further admitted in her deposition that although Big Lots requested that she inform them of her status by February of

---

[1] Simpson also claims that on the same day she sustained her injuries in the truck, she received complaints from two female employees that Collingsworth had been telling them inappropriate stories. Simpson claims to have reported these complaints to Pagan as well. However, inadmissible hearsay alone cannot suffice to defeat summary judgment. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 n. 10 (11th Cir. 2010) ("Alvarez also testified that other employees told her they heard similar discriminatory remarks, but she did not offer any affidavits or deposition testimony from them. Her testimony about what she heard secondhand is inadmissible hearsay, which cannot be used to defeat summary judgment.") (citation omitted).

2013, her physician did not fax the requested documentation to Big Lots until March 4, 2013, and Simpson took the doctor's note into the office the following day. *Id.* at 143–146. According to the affidavit of Rick Saenz, Regional Human Resources Manager for the area including Simpson's store, Big Lots terminated Simpson because after failing to respond by February 13, 2013, Simpson "was deemed to have resigned her employment as of February 13, 2013 and was administratively terminated." Saenz Aff. p. 6. Collingsworth submitted his resignation in September 2012. Ex. 27 to Simpson Depo.

## **STANDARD OF REVIEW**

A court may grant a movant's motion for summary judgment "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

In determining whether to grant the motion, the court must view "the evidence and all reasonable inferences from that evidence. . . in the light most favorable to the nonmovant." *Jean-Baptiste*, 627 F.3d at 820 (11th Cir. 2010); *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). However, the court need only draw those inferences "to the extent supportable by the record." *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010). Once met by the moving party, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## DISCUSSION

### I.  Title VII Sexual Harassment[2]

A plaintiff may rely on two theories to make out a sexual harassment claim: (1) that she suffered a tangible employment action or (2) that she was subjected to a hostile work environment. *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Circuit 2007). Additionally, "[w]hen a plaintiff proves that

---

[2] Plaintiff maintains three separate counts for "Title VII (Sexual Harassment)", "Title VII Hostile Work Environment)" and "Title VII (Termination)." Response p. 9 (doc. 19). Because Title VII sexual harassment claims may be established by showing that the plaintiff suffered a hostile work environment or a tangible employment action, i.e. termination, the court addresses all three of plaintiff's hostile work environment and "termination" claims under the heading of Title VII sexual harassment.

a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998). However, "[f]or any sexual harassment preceding the employment decision to be actionable . . . the conduct must be severe or pervasive." *Id.* at 754.

### A. Tangible Employment Action

Plaintiff suffered a tangible employment action in her termination, but has failed to establish that the tangible employment action she suffered was a result of the sexual harassment. "To be sure, termination is the ultimate change in the terms and conditions of employment because it ends them. But termination will support a claim only if it was caused by discrimination. *See Ellerth*, 524 U.S. at 760, 118 S. Ct. at 2268 (noting that an employer is liable if its 'discriminatory act *results* in a tangible employment action' (emphasis added))." *Baldwin v. Blue Cross Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir. 2007). Although Simpson claims her supervisor decided to retaliate against her as a result of her extended leave, *see* Pl. Depo. pp. 150-152, plaintiff does not dispute that she did not return Big Lots' requested documentation by February 13, 2013. Additionally, Rick Saenz swore by affidavit that plaintiff's failure to submit documentation concerning her

extended leave of absence was the reason for her termination. Accordingly, Simpson's tangible employment action claim fails because she cannot establish that her termination was the result of the alleged discrimination she suffered. Thus, summary judgment is due to be granted in favor of Big Lots against plaintiff's tangible employment action claim.

### B.     Hostile Work Environment

#### 1.     Prima Facie Case

A person seeking to make out a sexual harassment hostile work environment claim must demonstrate the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).  Moreover, the Plaintiff must show that the alleged conduct was both subjectively and objectively offensive:

> The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person

> would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

*Mendoza,* 195 F.3d at 1246 (citations omitted). Although Simpson alleges that Colingsworth touched her arms, shoulders, and hands, this behavior is neither objectively severe or pervasive. No reasonable person would find such behavior hostile or abusive, and Simpson does not allege that Collingsworth touched her arms or shoulders on so many occasions as to constitute pervasive behavior. Moreover, Collingsworth's attempt to kiss Simpson is neither objectively severe or pervasive, given that Simpson alleges this occurred only once. However, a genuine issue of material fact exists as to whether Collingsworth's endless story-telling, references to women's breasts and butts, and comments about sex and his penis constituted objectively hostile or abusive behavior, especially if such comments were directed only at women in the office as plaintiff alleges. For instance in *Reeves v. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010), the Eleventh Circuit determined that

> [e]vidence that co-workers aimed their insults at a protected group may give rise to the inference of an intent to discriminate on the basis of sex, even when those insults are not directed at the individual employee. A jury could infer the requisite intent to discriminate when that employee complained to her employer about the humiliating and degrading nature of the commentary about women as a group and the conduct persisted

unabated.

*Id.* at 811. In that case, the Eleventh Circuit determined that "[t]he terms 'whore,' 'bitch,' and 'cunt,' the vulgar discussions of women's breasts, nipples, and buttocks, and the pornographic image of a woman in the office were each targeted at Reeves's gender." *Id.* at 811–12. Viewing the evidence in a light most favorable to Simpson, Collingsworth's behavior could certainly give rise to an inference of an intent to discriminate on the basis of sex. According to Simpson's deposition testimony, Collingsworth constantly made remarks about his female co-workers' breasts, the breasts and buttocks of female customers, the size of his penis, and his sexual exploits. Moreover, by Simpson's account, Collingsworth told these stories only to female employees. Thus, Simpson has established that at least a genuine issue of material fact exists as to whether a hostile work environment persisted at Big Lots.

### 2. Big Lots' *Faragher-Ellerth* Defense

Despite Collingsworth's reprehensible and repulsive behavior, plaintiff's hostile work environment claim cannot overcome Big Lots' *Faragher-Ellerth* defense. In fact, plaintiff makes absolutely no mention of Big Lots' invocation of the *Faragher-Ellerth* defense in her response. "The *Faragher-Ellerth* defense is not available where the discrimination the employee has suffered included a

tangible employment action. *See Ellerth*, 524 U.S. at 762–63, 765, 118 S.Ct. at 2269, 2270; *see also Faragher*, 524 U.S. at 808, 118 S.Ct. at 2293." Yet, the court has already determined that Simpson has failed to establish that her termination was the result of her sexual discrimination. Thus, "[t]he only arguable basis for recovery that she has is hostile environment discrimination, and the *Faragher-Ellerth* defense is available to an employer defending against that type of Title VII claim." *Baldwin*, 480 F.3d at 1303.

> An employer avoids liability under this defense if: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior'; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293; *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270. Because it is an affirmative defense, the employer bears the burden of establishing both of these elements. *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir.2001).

*Id.*

As the Eleventh Circuit has noted, "there is nothing in the *Faragher* or *Ellerth* decisions requiring a company to conduct a full-blown, due process, trial-type proceeding in response to complaints of sexual harassment." *Baldwin*, 480 F.3d at 1304. Plaintiff conceded in her deposition that every time she made a complaint to Pagan, he arranged a meeting with her and informed her that he had spoken with Collingsworth. Additionally, the record includes three documents detailing disciplinary counseling given W.C. Collingsworth. *See* Ex. B to Defendants' Motion

for Summary Judgment pp. 12-13, 18 (doc. 16-4). Moreover, Big Lots conducted at least two investigations into the allegations against Collingsworth, in which plaintiff made no effort to participate. In fact, plaintiff admittedly attempted to hinder Big Lots' investigation by instructing Wilson not to turn over her documentation of Collingsworth's misbehavior. Big Lots has made a showing that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and that Simpson unreasonably failed to take advantage of any preventive or corrective opportunities it provided. In sum, Big Lots conducted a reasonable investigation in response to Simpson's allegations, and that investigation is enough to satisfy Big Lots' responsibility under Title VII. Thus, summary judgment is due to be granted in favor of Big Lots against Simpson's hostile work environment claim.

## II.     Title VII Retaliation Claim

Under *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013), "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or action of the employer." *Id.* In other words, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action

by the employer." *Id.* at 2534. *But see Ramirez v. Bausch & Lomb, Inc.*, No. 12-14679, _F. App'x_, slip op. at 7 n.2 (11th Cir. 2013) ("However, the Court did not clarify the role of 'but for' causation in a plaintiff's prima facie case."). Thus, the plaintiff always has the burden of persuasion "to proffer evidence sufficient to permit a reasonable fact finder to conclude that discriminatory animus was the 'but-for' cause of the adverse employment action." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (reconciling "but-for" causation and the McDonnell Douglas framework in ADEA case, and affirming summary judgment where appellant could not establish that discriminatory animus was the but-for cause of his termination). No evidence suggests that the but-for cause of Simpson's termination was her filing any sexual harassment complaints. Rather, Simpson's deposition testimony and Saenz's affidavit establish that Simpson was terminated after failing to respond to Big Lots' request for documentation following her extended leave. While plaintiff contends that her demotion to cashier after returning from leave constituted retaliation, plaintiff admitted in her deposition that she looked up and understood that Big Lots' policy prohibited them from holding her position open for longer than ninety days. Pl. Depo. p. 127. Moreover, the only retaliatory animus Simpson points to is Gary Pagan's desire to make her "pay" for having utilized worker's compensation. Accordingly, because Simpson

16

cannot establish that her having made any sexual harassment complaints was the but-for cause of her termination, her Title VII retaliation claim is due to be dismissed.

## CONCLUSION

Based upon a consideration of the foregoing, the court finds that defendant's motion for summary judgment (doc. 14) is due to be **GRANTED**. The court shall grant said motion by separate Order.

**DONE** and **ORDERED** this 8th day of July 2014.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE